UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Anthony Clark,                                          Civil No. 11-0577 (DSD/JJG)

         Plaintiff,

v.                                                                   REPORT AND RECOMMENDATION

Michael J. Astrue, Commissioner of
Social Security,

         Defendant.
_____

JEANNE J. GRAHAM, United States Magistrate Judge

     Plaintiff Anthony Clark seeks judicial review of the denial of his application for Social Security supplemental security income (SSI) benefits. The case was referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and is presently before the Court on cross-motions for summary judgment. Clark's points of error relate primarily to his alleged mental impairment. He argues that the Administrative Law Judge (ALJ) did not give appropriate weight to his psychologist's opinion, did not fully and fairly develop the record, wrongly weighed his denial of mental health concerns and failure to seek treatment against him, and propounded an inaccurate hypothetical question to the vocational expert at the hearing. The Defendant Commissioner refutes these arguments and asks the Court to uphold the denial of benefits. For the reasons set forth below, the Court recommends that Clark's motion be denied, the Commissioner's motion be granted, and the case be dismissed with prejudice.

I.      BACKGROUND

     Clark protectively filed an application for SSI benefits on June 27, 2007, alleging an onset of disability date of June 5, 2007. He was thirty-one years old at the time, and his alleged

disabilities included a shoulder dislocation and a depressive disorder. The application was denied at all stages of the administrative process.

### A.     Medical Evidence Predating the ALJ's Decision

Clark provided medical evidence to the Social Security Administration both before and after the ALJ's decision, and the Court divides its summation of the evidence accordingly. In addition, Clark's arguments for summary judgment pertain primarily to his mental impairment, and thus, the Court will only briefly summarize records pertaining to his shoulder impairment.

#### 1.     Shoulder Impairment

In June 2007, Clark injured his shoulder while reportedly wrestling with a friend. (R. at 339.) A subsequent MRI revealed partial tearing of the rotator cuff and a small effusion of the shoulder joint, along with a large, irregular fracture. (*Id.* at 361.) Dr. Jean Eelma performed reconstructive shoulder surgery on July 11, 2007. (*Id.* at 386.)

Consultative physician Gregory H. Salmi completed a Physical Residual Functional Capacity Assessment on August 6, 2007. (*Id.* at 392.) He concluded that Clark could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. (*Id.* at 386.) Further, while Clark's ability to reach overhead was limited to occasional use, other manipulative abilities were unlimited. (*Id.*)

On August 19, 2007, Clark sought treatment at an emergency room for right shoulder pain. (*Id.* at 397.) He reported no other symptoms and was prescribed Vicodin for the pain. (*Id.* at 399.) Clark returned to the emergency room the following month, reporting severe shoulder pain caused by moving and lifting objects. (*Id.* at 402.) Clark appeared sleepy with a flat affect, but

2

was oriented with normal memory and judgment. (*Id.* at 403.) The provider noted that Clark could have reinjured his shoulder, but was also engaged in drug-seeking behavior. (*Id.*)

### 2. Mental Impairment

Agency consultant Dr. Owen Nelsen completed a Psychiatric Review Technique for the time period of April 1, 2006 through May 10, 2006. (*Id.* at 304-16.) He found no medically determinable mental impairment. (*Id.*)

On February 28, 2007, Clark sought treatment for depression and stress during a routine physical examination with certified nurse practitioner Melanee Buckentin. (*Id.* at 335-36.) Clark said he had taken Prozac a few years ago but stopped once he felt better. (*Id.* at 335.) Buckentin noted no particular concerns or observations concerning Clark's mental state and prescribed Prozac. (*Id.* at 335.)

Agency psychologist Dr. Ray M. Conroe completed a Psychiatric Review Technique Form on August 6, 2007, for the time period of June 5, 2007 through August 6, 2007. (*Id.* at 371-83.) He assessed Clark under Listing 12.04 (affective disorders) and determined that Clark's mental impairment was not severe. (*Id.*) To meet the requirements of Listing 12.04 for a mood disturbance evidenced by a depressive syndrome, a claimant must display four of nine criteria. (*Id.* at 374.) While Clark met two criteria—decreased energy and feelings of guilt or worthlessness—he did not have anhedonia or a pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, difficulty concentrating or thinking, thoughts of suicide, or hallucinations, delusions, or paranoid thinking. (*Id.*) Under the "B" Criteria of Listing 12.04, Clark was found only mildly limited in two categories of functioning. (*Id.* at 381.) Dr. Conroe noted that Clark had previously denied psychiatric symptoms to his doctor, and that the doctor described Clark as alert, oriented,

and with an appropriate affect. (*Id.* at 383.) Dr. Conroe further remarked that Clark also cared for his children and himself, did housework, drove a car, shopped, managed his finances, watched television, visited with family, and got along well with others. (*Id.*)

On March 13, 2009, Dr. Timothy Piehler prepared a Medical Examination/Exchange of Information form for the Minnesota Family Investment Program (MFIP). (*Id.* at 421-22.) There is no evidence of a treatment relationship between Clark and Dr. Piehler prior to the date the form was completed. Dr. Piehler wrote that Clark suffered from a depressive disorder manifested by low energy and low motivation to seek work. (*Id.* at 424.) According to Dr. Piehler, Clark's illnesses and injuries prevented him from working in any capacity. (*Id.*) Dr. Piehler did not specify the length of time Clark was unable to work, however, and he also opined that Clark's symptoms could improve with therapy and medication. (*Id.*) Dr. Piehler hoped Clark could complete job training in the future and noted Clark was seeing a psychotherapist every other week for his depression. (*Id.*)

**B.     Other Evidence of Record**

Clark completed a Function Report on July 7, 2007. His daily activities consisted of watching television, sitting in his yard, and talking to his children. (*Id.* at 221.) He prepared his meals in a microwave but said he was unable to do any other household chores. (*Id.* at 223.)

**C.     Proceedings Before the ALJ**

After Clark's SSI application was denied initially and on reconsideration, he requested a hearing before an ALJ. (*Id.*) That hearing occurred on September 10, 2009. (*Id.*)

Clark testified at the hearing that he lived at home with two of his children. (*Id.* at 29.) He cared for their needs, cooked simple meals, and did housework with his parents' help. (*Id.* at 32.) He had a GED and knew how to read, write, and do basic math. (*Id.* at 30.) Clark testified he

4

suffered from pain, depression, and shoulder, back, and leg problems. (*Id.* at 30-31.) He slept poorly at night but napped for several hours a day. (*Id.* at 33.) Otherwise, he spent his days watching television and reading. (*Id.* at 33-34.) Clark felt he could walk a few blocks at a time, stand for twenty minutes, lift twenty pounds, and sit for twenty to thirty minutes at a time. (*Id.* at 36.) His thought processes were okay, although he found it difficult to concentrate on a television program unless it interested him. (*Id.* at 37, 38.)

A medical expert, Dr. Paul Gannon, also testified. Dr. Gannon's primary specialties are thoracic and cardiovascular surgery, with a secondary specialty of general surgery. (*Id.* at 114.) After summarizing the medical evidence of Clark's physical and mental impairments, Dr. Gannon opined that Clark would be limited to a light residual functional capacity (RFC), with restricted overhead reaching. (*Id.* at 41-42.)

The ALJ next asked Mr. Steve Bosch,[1] a vocational expert, to consider a thirty-three year old person with a high school education, past work experience as a kitchen helper and warehouse worker, who is impaired by chronic shoulder and back pain, depression, anxiety, and a history of alcohol abuse. (*Id.* at 45.) This hypothetical person would be limited in his ability to lift, stand, walk, sit, push, pull, and lift overhead. (*Id.*) Further, the work assigned to this person must be simple and unskilled in nature, with no required reading or report-writing. (*Id.*) Mr. Bosch testified that a person with these characteristics and limitations could work as a janitor/cleaner, product assembler, or molding machine tender. (*Id.* at 46.)

The ALJ issued an unfavorable decision on January 6, 2010, concluding that Clark was not disabled. (*Id.* at 10, 13.) Following the sequential evaluation process for disability

---

[1] The administrative hearing transcript identifies the vocational expert as "Mr. Bausch," but his professional qualifications identify him as "Steve Bosch" (R. at 116). The Court will use the latter spelling.

5

determinations promulgated in 20 C.F.R. § 416.920(a)(4), the ALJ first determined that Clark had not engaged in substantial gainful activity since June 27, 2007. (R. at 15.) Next, the ALJ found that Clark suffered from severe impairments of depressive disorder and post-surgical shoulder dislocation. (*Id.*) At the third step, however, the ALJ found no impairment or combination of impairments meeting or medically equaling a listed impairment. (*Id.* at 16.) In assessing Clark's physical impairments, the ALJ relied primarily on Dr. Gannon's testimony and the paucity of objective medical evidence. (*Id.*) In assessing Clark's mental impairments, the ALJ determined that Clark was no more than mildly or moderately limited in the four relevant areas of functioning. (*Id.*) The ALJ assigned no weight to Dr. Piehler's opinion on the MFIP form.

The ALJ then proceeded to step four of the sequential evaluation and considered Clark's symptoms to the extent they were consistent with the medical record and other evidence. (*Id.* at 17.) The ALJ noted Clark had dislocated his right shoulder twice: during a fight in 2004 and while wrestling with a friend in 2007. (*Id.* at 18.) Surgery and conservative treatment did not fully relieve his pain, but there was also evidence of drug-seeking behavior and malingering. (*Id.*) Clark stopped seeking medical attention for his shoulder in late 2007. (*Id.*) As for Clark's depression, the ALJ found little evidence of treatment with medication, no treatment records from Clark's psychotherapist, and no medical evidence of difficulty with attention, concentration, pace, or persistence. (*Id.*) The ALJ also concluded that Clark's subjective complaints were inconsistent with his daily routine and testimony. (*Id.* at 18-19.) Based on these findings and the record, the ALJ assessed Clark's RFC as able "to lift or carry no more than 20 pounds; sit, stand, or walk 6 hours each per 8-hour day; no overhead lifting; limited ability to

6

push or pull, especially on the right; alcohol-free work environment; simple, unskilled work; and no required reading or writing to perform the job." (*Id.* at 17.)

With this RFC, Clark would not be able to work in his past occupation as a kitchen helper. (*Id.* at 20.) The ALJ therefore proceeded to step five, where he determined that Clark could work as a cleaner or janitor, molding machine tender, or product assembler. (*Id.* at 21.) As such, Clark was deemed not disabled.

### D.     Medical Evidence Submitted One Day Prior to and After the ALJ's Decision

On January 5, 2010, one day before the ALJ issued his decision, Clark's attorney faxed a letter and ten pages of medical evidence to the ALJ. (*Id.* at 425.) All of the medical evidence was already included in the record, and the ALJ did not refer to the duplicate evidence or letter in his decision. After the ALJ issued his decision, Clark requested review by the Appeals Council and submitted additional evidence. (*Id.* at 5, 7.) The new evidence consisted of the ten pages of duplicate evidence, as well as psychiatric therapy notes and treatment notes from July 10, 2009 through May 6, 2010. (*Id.* at 5, 425-57.) That evidence is summarized below.

On June 10, 2009, Clark attended a therapy session with Dr. Piehler, who described Clark as engaged and cooperative, although anxious, with a congruent mood, fair attention, fair concentration, fair insight, and fair judgment. (*Id.* at 436.) Dr. Piehler thought Clark was making progress in managing his mood and accepting his chronic pain issues. (*Id.*)

Clark saw certified nurse practitioner Sandra R. Lindell on July 20, 2009 for routine medication management. (*Id.* at 438.) Lindell remarked that Clark had missed two follow-up appointments but wanted his prescriptions refilled. (*Id.*) Although Clark described ongoing stressors from being a single father and suffering from chronic pain, he denied acute concerns and said Celexa and therapy were helpful. (*Id.*) Lindell described Clark as cooperative and

pleasant, though stressed and with a restricted affect. (*Id.*) Lindell advised Clark to continue taking Celexa and seeing a therapist. (*Id.* at 439.)

Clark met again with Dr. Piehler on August 14, 2009. (*Id.* at 440.) The treatment record refers to a dictated note for session content, but no such note is associated with the record. (*Id*.) The record itself is notable only for its lack of medical observations or findings. Dr. Piehler described Clark as engaged, cooperative, with a depressed mood, logical thought processes, fair attention and concentration, intact language, and fair insight and judgment. (*Id.*) The only other substantive remark was a vague statement that Clark was "restructuring his maladaptive cognitions that are maintaining his depressive mood." (*Id.*) Dr. Piehler's later treatment records are similar in brevity. (*See id.* at 442, 444, 446, 450, 454, 456.)

Clark saw Dr. Michelle Wiersgalla on December 18, 2009 for routine medication management. (*Id.* at 448.) He reported struggling with pain and feeling down, but said Celexa was partially helpful in treating his depression. (*Id.*) Dr. Wiersgalla increased Clark's dosage of Celexa and advised him to follow up in three months. (*Id.* at 449.) Clark returned to Dr. Wiersgalla on March 19, 2010, reporting continued pain and additional stressors caused by two of his children moving in with him. (*Id.* at 452.) Dr. Wiersgalla described Clark as cooperative and very pleasant, with an "ok" mood and a less subdued affect. (*Id.*)

The Appeals Council made the additional evidence part of the record, but nonetheless denied review of the ALJ's decision. (*Id.* at 1). The ALJ's decision therefore became the final decision of the Commissioner.

## II. STANDARD OF REVIEW

To receive SSI benefits, an individual must be found disabled as defined by the Social Security Act and accompanying regulations. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir.

2010); 20 C.F.R. § 416.901. Disabled is defined "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). It is the claimant's burden to prove disability. *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011).

On review of a decision denying Social Security benefits, a court examines whether the findings and conclusion of the ALJ are legally sound and "supported by substantial evidence in the record as a whole." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (citation omitted). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's decision." *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). Although the Court must consider "[e]vidence that both supports and detracts from the ALJ's decision," the ALJ's decision may not be reversed merely because some evidence supports another outcome. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). If it is possible to reach conflicting positions from the record, but one of those positions is that of the ALJ, the decision must be affirmed. *Id.* When new evidence is submitted to and considered by the Appeals Council, the Court "must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

### III.  DISCUSSION

#### A.  Dr. Piehler's Opinion

Clark challenges the ALJ's decision to give Dr. Piehler's opinion no weight. An ALJ must give controlling weight to a treating physician's opinion "if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with

other substantial evidence in the record." *Clevenger v. Soc. Sec. Admin.*, 567 F.3d 971, 975 (8th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). If the opinion does not meet these criteria, the ALJ may properly reject it. *Id.* (citing *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005)).

Here, the ALJ correctly determined that Dr. Piehler's findings were not supported by the medical record. At the time the ALJ made his decision, the only evidence from Dr. Piehler was the MFIP form. The opinions expressed on the form were not supported by any clinical or laboratory diagnostic techniques, or indeed, any medical evidence at all. On review of the ALJ's decision, however, the Court must view all evidence of record, including the new evidence submitted to the Appeals Council, in determining whether the decision is supported by substantial evidence in the record as a whole.

No treatment records, including those from Dr. Piehler, reflect that Clark suffered from such low energy or motivation that he was unable to work. To the contrary, Dr. Piehler described Clark as "engaged" and "cooperative" with normal speech, logical thought processes, fair attention and concentration, and fair insight and judgment. There is not even a suggestion that Clark suffered from a disabling lack of energy or motivation. In addition, there are no clinical or diagnostic findings by Dr. Piehler or any other mental health professional supporting Dr. Piehler's opinion.

With respect to Dr. Piehler's professed belief that Clark was unable to work, the ALJ noted that the state agency for which the opinion was rendered did not have the same disability standard as the Social Security Administration. Although the ALJ did not describe the difference between the standards, one difference is patently clear. To be disabled under the Social Security Act, the individual must be precluded from working by an impairment lasting at least twelve

months in continuous duration. Dr. Piehler made no such finding on the MFIP form. Not only did Dr. Piehler fail to specify the length of time Clark could not work, but he hoped that Clark's symptoms would improve with therapy and medication and that Clark soon would be able to complete job training. These comments are not consistent with a disability lasting or expected to last more than a continuous twelve months. Further, even if Dr. Piehler's opinion had related to Clark's ability to work under the SSI standard, the ALJ was not obligated to accept it, as the ultimate determination of disability is reserved exclusively to the Commissioner. 20 C.F.R. § 416.927(e)(1).

The administrative record does not contain the determination made by the MFIP, and thus the Court cannot be sure Clark qualified for the program. But even if the state agency had approved Clark's application, the decision would not have bound the ALJ, as a disability determination made by another governmental agency is not binding on the Social Security Administration. 20 C.F.R. § 416.904.

For all of the above reasons, substantial evidence in the record as a whole supports the ALJ's decision to award no weight to Dr. Piehler's opinions expressed on the MFIP form.

### B.     The ALJ's Duty to Fully and Fairly Develop the Record

Clark next argues the ALJ had an obligation to request treatment notes from Dr. Wiersgalla and Dr. Piehler but failed to do so. Due to the non-adversarial nature of an administrative hearing, an ALJ has a duty to "neutrally develop the facts." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). An ALJ is not required, however, "to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Id.* The ALJ must contact a treating physician only when the records submitted by the claimant are "inadequate for us to determine whether you are disabled." 20 C.F.R. § 416.912(e); *see Goff*, 421

11

F.3d at 791. These circumstances include "when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.912(e)(1).

Clark's challenge to the ALJ's development of the record essentially became moot once his attorney provided the additional records to the Appeals Council. Nonetheless, considering those records, as the Court must when additional evidence is submitted to the Appeals Council, the Court finds that the ALJ did not leave a crucial area undeveloped.

Dr. Wiersgalla's treatment of Clark was sporadic and unremarkable. Clark did not see Dr. Wiersgalla for a nine-month period between March 2009 and December 2009, and when he returned to Dr. Wiersgalla in December, her findings and observations were essentially normal. At Clark's next appointment in March 2010, Dr. Wiersgalla described him as cooperative and very pleasant, with an average mood and a less subdued affect. Clark does not specify how Dr. Wiersgalla's records are inconsistent with the ALJ's findings, nor has he identified any conflict or ambiguity within her records, shown that her records lacked essential information, or demonstrated that her clinical or diagnostic techniques were unacceptable.

As for Dr. Piehler, Clark asserts the ALJ should have contacted him for additional evidence upon finding his opinion ambiguous. But the ALJ did not find Dr. Piehler's opinion "ambiguous." He found Dr. Piehler's remarks on the MFIP form conclusory and unsupported by any medical evidence in the record, which was accurate. An ALJ may properly dismiss a treating source's opinion as inconsistent with the record without requesting additional records from the source. *See Goff*, 421 F.3d at 791. As with Dr. Wiersgalla, Clark has not identified information in the additional records from Dr. Piehler that would have changed the ALJ's decision. Indeed, Dr.

Piehler's treatment notes are inconsistent with the statements he made on the MFIP form, and they support, rather than detract from, the ALJ's findings.

Clark further asserts the ALJ had a "duty to request" a mental RFC assessment by either his treating providers or a consultative examiner, but he cites no authority for this proposition. (Pl.'s Mem. Supp. Mot. Summ. J. at 17.) As discussed above, an ALJ must contact a treating source for additional evidence only if the source's records contain a material conflict or ambiguity, the existing records do not contain all essential information, or if an opinion is not based on acceptable clinical or laboratory findings. None of these circumstances were present in Clark's case.

An ALJ should order a consultative examination by a non-treating doctor in only limited circumstances: (1) when the medical and nonmedical evidence of record is insufficient to make a decision, (2) when necessary evidence is not contained in the treating source's records, (3) if evidence cannot be obtained for reasons beyond the claimant's control, (4) if a treating source is unable to provide highly technical or specialized evidence, (5) when a conflict, inconsistency, ambiguity, or insufficiency must be resolved; or (6) if there was a change in the claimant's condition. 20 C.F.R. § 416.919a(b). None of these circumstances were present, either.

Although Clark attempts to paint his providers' treatment records as ambiguous or inconsistent, his providers were in agreement in their observations and findings. Dr. Wiersgalla and Dr. Piehler consistently remarked that Clark was engaged and cooperative; demonstrated fair attention, concentration, insight, and judgment; but frequently had an anxious, down, or stressed mood. Clark regularly reported to his doctors that Prozac and Celexa helped his symptoms of depression. Neither Dr. Wiersgalla's nor Dr. Piehler's notes contain any functional limitations, testing results, or indication that Clark's depression was disabling. There is simply no

inconsistency or ambiguity to resolve. The only possible exception is Dr. Piehler's opinion rendered on the MFIP form, which, as discussed above, was properly rejected on several grounds, and did not create an inconsistency or ambiguity in the record necessitating a mental RFC assessment.

### C. Clark's Failure to Seek Treatment

On several occasions, Clark denied having any mental health issues. (R. at 366, 383, 399, 418.) Clark submits that the ALJ should have considered his failure to seek treatment as a symptom of his mental illness, rather than weigh his lack of treatment against him. He relies on the Eighth Circuit decision, *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009), for support.

*Pate-Fires* is distinguishable from the present case in two crucial respects. First, the claimant in *Pate-Fires* suffered from a schizoaffective or bipolar disorder, not depression. *Id.* at 946. In *Wildman v. Astrue*, 596 F.3d 959 (8th Cir. 2010), decided a year after *Pate-Fires*, the Eighth Circuit distinguished *Pate-Fires* on this very basis. *Id.* at 966. The *Wildman* court also distinguished *Pate-Fires* on the ground there was evidence directly linking the claimant's mental limitations to her noncompliance with treatment. *Id.* Based on these two distinctions, the court found *Pate-Fires* inapposite and the claimant's noncompliance with treatment unjustified. *Id.*

This case is more like *Wildman* than *Pate-Fires*. Clark suffers from depression, not a schizoaffective or bipolar disorder, and there is no evidence directly linking his depression with his denial of mental health issues or failure to seek treatment. Accordingly, the ALJ properly weighed his lack of treatment against him. *See Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011) (recognizing that failure to seek medical treatment for mental illness is a permissible factor in determining that claimant did not suffer from a disabling mental impairment).

As far as Clark's reliance on SSR 96–7p, this ruling warns an ALJ not to draw any adverse inference about a claimant's impairments, based on a failure to seek regular medical treatment, "without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96–7p, 1996 WL 374186, at *7 (Soc. Sec. Admin., July 2, 1996). Clark neither provided any such explanations to the ALJ nor identified evidence in the record explaining his infrequent attempts to seek treatment for his depression. As such, the ALJ properly weighed Clark's denial of mental health issues and failure to seek treatment against him.

### D.   Clark's Activities of Daily Living

Clark argues that the ALJ erroneously relied on his activities of daily living to find him not disabled. Clark misunderstands the context of the ALJ's consideration of his daily activities. The ALJ did not use Clark's daily activities to conclude that he could work full-time; rather, the ALJ considered Clark's daily activities in assessing his credibility. As the ALJ specifically remarked, Clark's "active daily routine is inconsistent with his subjective complaints." (R. at 18.) An ALJ may properly consider a claimant's daily activities in assessing credibility. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ did not err by considering Clark's activities of daily living as a factor affecting his credibility[2]

### E.   The ALJ's Determination of Clark's RFC

The ALJ based his physical RFC findings heavily on the opinion of Dr. Gannon, the medical expert who testified at the hearing. Dr. Gannon is a surgeon, not a psychologist or

---

[2]   Clark does not contest the ALJ's actual credibility determination.

psychiatrist. Clark submits that the ALJ erred in crediting Dr. Gannon's opinion over Dr. Piehler's with respect to Clark's mental impairment.

As the ALJ acknowledged in his decision, he relied on Dr. Gannon's testimony only in assessing Clark's *physical* impairments. (R. at 16, 19.) To assess Clark's mental impairment, the ALJ looked to the treatment record from Ms. Buckentin and the MFIP form completed by Dr. Piehler. (*Id.* at 18.) The ALJ took specific note of the two-year lapse between appointments with Ms. Buckentin and Dr. Piehler for treatment of Clark's depression, Clark's failure to renew his prescription for Prozac for more than two years, the lack of any treatment records from Clark's psychotherapist or psychologist, and the lack of any objective medical support for Clark's purported difficulties with attention, concentration, pace, and persistence. (*Id.*) Given the limited record before him, the ALJ's assessment of Clark's mental impairments was supported by substantial evidence in the record as a whole.

The records Clark submitted to the Appeals Council from his mental health providers do not alter the Court's conclusion. Dr. Piehler repeatedly described Clark as engaged and cooperative, although anxious, with fair attention, concentration, insight, and judgment. Dr. Piehler also praised Clark for making progress in managing his mood and accepting his chronic pain issues. Lindell noted that Clark felt stress from being a single father and feeling chronic pain, but Clark denied any serious concerns and said Celexa and therapy were helpful. Lindell described Clark as cooperative and pleasant, though stressed and with a restricted affect. Dr. Wiersgalla also reported that Celexa was effective, and she described Clark as cooperative, very pleasant, with an "ok" mood and a less subdued affect. These treatment notes are consistent with the ALJ's mental RFC assessment.

The ALJ also considered Clark's daily activities and prior work history in assessing his subjective complaints, which are proper components of the RFC determination. *See Polaski*, 739 F.2d at 1322. Clark does not challenge these aspects of the RFC determination.

Lastly, although the ALJ placed little weight on the opinions of two non-examining agency psychological consultants, Dr. Nelsen and Dr. Conroe, because their opinions predated some of the evidence in the record, the ALJ's finding that Clark could perform a limited range of unskilled work was consistent with their findings.

### F.     The Hypothetical Question Posed to the Vocational Expert, Mr. Bosch

Clark contends that the hypothetical question posed to the vocational expert, Mr. Bosch, was incomplete because it failed to include symptoms of his depression. Clark's reading of the hypothetical question is incorrect. The ALJ included the impairments of depression and anxiety in the hypothetical question to Mr. Bosch. The ALJ further explained that the person would be limited to simple, unskilled work with no reading or writing. (R. at 45.) These limitations were imposed specifically in light of Clark's depression. (*Id.* at 20.)

In forming a hypothetical question for a vocational expert, an ALJ must include only the impairments and limitations that are supported by the record and deemed credible. *See Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004); *Prosch v. Apfel*, 201 F.3d 1010, 1015 (8th Cir. 2000). Here, the ALJ found that Clark's depression limited him to simple, unskilled work with no reading or writing. This corresponds with other findings made by the ALJ, such as that Clark's depression caused mild restrictions in his activities of daily living, mild restrictions in maintaining social functioning, and moderate restrictions in maintaining concentration, persistence, and pace. Objective medical records confirm these findings. More than two years passed between the time Clark sought treatment for depression from Ms. Buckentin in February

17

2007 and when he began treating with Dr. Piehler in 2009. In Dr. Piehler's treatment notes, he generally described Clark as engaged, cooperative, and anxious, with fair attention, concentration, insight, and judgment. Similarly, Dr. Wiersgalla described Clark as cooperative and pleasant with an ordinary mood. There is no mention of decreased energy or difficulty concentrating in the treatment records. The limitations caused by Clark's depression, as described in the hypothetical question, are well-supported by the record.

Nevertheless, Clark persists that since the ALJ found him severely impaired by depression at step two of the sequential evaluation, he was compelled to include symptoms itemized in Listing 12.04, 20 C.F.R. Pt. 404, Subpt. P, App. 1, into the hypothetical question. In so arguing, Clark confuses steps two and three of the sequential evaluation. The ALJ found at step two that Clark's depression was a severe impairment. A "severe impairment" is one that significantly limits a person's mental or physical ability to perform simple work activities. 20 C.F.R. § 416.920(c). Having a severe impairment at step two, however, does not automatically mean a person meets the requirements for a listed impairment. Whether a person meets or equals a listed impairment is a separate inquiry, made at step three. 20 C.F.R. § 416.920(a)(iii). Thus, finding a severe impairment at step two did not require the ALJ to include the limitations of Listing 12.04 in the hypothetical question. Indeed, Clark concedes his impairments do not meet or equal the limitations of Listing 12.04. (Pl.'s Mem. Supp. Mot. Summ. J. at 15.)

The ALJ conveyed to Dr. Bosch the impairments and limitations he found credible and supported by the record. The ALJ did not err in assessing those limitations and impairments. Accordingly, the hypothetical question was accurate and complete.

## IV.     RECOMMENDATION

In reviewing the final decision of the Commissioner, the Court has considered the evidence submitted to the ALJ as well as the new evidence Clark provided to the Appeals Council. The Court concludes that the ALJ's determination that Clark was not disabled is legally sound and supported by substantial evidence.

Accordingly, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff Anthony Clark's Motion for Summary Judgment (Doc. No. 12) be **DENIED**;

2.      Defendant Commissioner's Motion for Summary Judgment (Doc. No. 20) be **GRANTED**;

3.      This case be **DISMISSED WITH PREJUDICE**; and

4.      **JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: January 30, 2012

                                      *s/ Jeanne J. Graham*
                                      JEANNE J. GRAHAM
                                      United States Magistrate Judge


### NOTICE

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **February 14, 2012**. A party may respond to the objections within fourteen days after service thereof. Any objections or responses shall not exceed 3,500 words. The district judge will make a de novo determination of those portions of the Report and Recommendation to which an objection is made.